**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARCIA BRAUNER** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  24-6512** |
| | : | |
| **MEDSCOPE AMERICA** | : | |
| **CORPORATION, MEDICAL** | : | |
| **GUARDIAN, LLC** | : | |

<u>**MEMORANDUM**</u>

**MURPHY, J.**                                                                                            **March 2, 2026**

Marcia Brauner was hired into the IT department at MedScope America Corporation

during a transitionary period for the company: MedScope had been acquired by Medical

Guardian the previous year, and the two entities quickly merged responsibilities.  The merger

reduced the workload across MedScope's IT team, and Ms. Brauner felt the brunt of these

changes.  Ultimately, Ms. Brauner's job was eliminated.

During her time with Medscope, some fellow employees made offensive comments to

Ms. Brauner.  This led her to sue MedScope and Medical Guardian, alleging that they

discriminated against her and harassed her because of her age and sex, and retaliated against her

for complaining about it.  We recognize that it's neither appropriate nor pleasant to be on the

receiving end of distasteful conduct, but anti-discrimination statutes "do[] not set forth a

general civility code for the American workplace."  *Burlington N. & Santa Fe Ry. Co. v. White*,

548 U.S. 53, 68 (2006) (citation modified).  Rather, to prevail on her discrimination claims, Ms.

Brauner must show that her protected traits or activities "actually motivated or had a

determinative influence on the employer's adverse employment decision."  *Fasold v. Just.,* 409

F.3d 178, 183-84 (3d Cir. 2005) (citation modified).  Because no reasonable jury could reach

such a conclusion from the record evidence in this case, we grant the defendants' motion for

summary judgment.

## I.    FACTUAL BACKGROUND

Medical Guardian is a leading provider of personal emergency response systems.  DI 18-2 at ¶ 4.[1]  In 2021, Medical Guardian acquired MedScope.  *Id.* at ¶ 5.  Both Medical Guardian and MedScope use Customer Relationship Management (CRM) software to handle customer intake, inventory, customer care, and billing.  *Id.* at ¶ 6.  However, at the time that Medical Guardian acquired MedScope, the companies used different CRM software: Medical Guardian used Salesforce and MedScope used Dynamics, supported by Microsoft.  *Id*. at ¶ 7.  In 2022, Microsoft upgraded Dynamics to a cloud-based platform.  *Id.* at ¶ 8.

Ms. Brauner was hired by MedScope to help facilitate the company's move to this cloud-based platform.  DI 18-2 at ¶ 13; DI 18-3 at 143-44.  She began work on July 11, 2022 at the age of 49.  DI 18-3 at 141; DI 19-4 at ¶ 1.  Her title was IT Manager, and she was tasked with documenting everything that the old MedScope CRM system did to make sure these processes were covered by and integrated into the cloud-based platform.  DI 18-2 at ¶ 13.  Ms. Brauner had one direct report: business analyst Renu Liben.  DI 18-3 at 188.

Ms. Brauner worked closely with Andrew Tamarin, who oversaw the daily operations of the MedScope IT Department.  DI 18-2 at ¶ 10.  Mr. Tamarin had four direct reports and also oversaw numerous offshore contractors. DI 18-2 at ¶ 18; DI 18-3 at 188.  Both Ms. Brauner and Mr. Tamarin reported to Maria Greendyk who was the Director of IT within MedScope.  DI 18-3 at 141; *see also* DI 18-3 at 188.  Ms. Greendyk reported to Bryan Johnson, who was the Vice President of IT over the MedScope line of business, and Mr. Johnson reported to Brian

---

[1] We adopt the sequential pagination supplied by the CM/ECF docketing system.

Simmermon, the Chief Information Officer of the company.  *See* DI 18-3 at 188.

During company meetings, Ms. Brauner recalls having her comments dismissed as "trivial" by Pete Cava, who worked as a director of IT in the Medical Guardian side of the business.  *See* DI 19-4 at ¶ 12; DI 19-5 at 6, 15:10-20[2]; DI 19-5 at 9, 29:21-24.  Ms. Brauner also recalls Mr. Simmermon telling Ms. Brauner, "give them enough rope, so they can hang themselves" in the context of how to manage employees.  DI 19-4 at ¶ 13; DI 19-5 at 6, 16:8-9.  Overall, Ms. Brauner felt that Mr. Simmermon's attitude was very "male dominated" and that he didn't care what she had to say.  DI 19-4 at ¶ 14; DI 19-5 at 36, 135:7-14.  Ms. Brauner also felt that Mr. Simmermon treated younger employees more warmly than her.   DI 19-4 at ¶ 15; DI 19-5 at 44, 166:21-167:3.

Ms. Brauner raised these issues with both Mr. Tamarin and Ms. Greendyk.   DI 19-4 at ¶ 16; DI 19-5 at 6, 16:10-12.  Specifically, she remembers telling Ms. Greendyk that Mr. Simmermon's comment about employees killing themselves was "uncalled for" and that "I'm treated differently and I feel like I'm always being put down based on the remarks that are made by male figures or individuals at Medical Guardian."  DI 19-4 at ¶¶ 17-18; DI 19-5 at 10-11, 33:9-34:6; DI 19-5 at 26, 97:6-12.

While this was happening, company leadership decided to abandon MedScope's upgrade to Microsoft's cloud-based model and instead merge the MedScope and Medical Guardian IT departments with all parties using Salesforce.  DI 18-2 at ¶ 14.  Ms. Brauner's position, however, remained largely unchanged as she continued to document the processes of the old CRM system

---

[2] When citing to deposition transcripts, the first part of the cite is to where the deposition transcript is located in the record.  Then the second part of the cite is to the page and line number from the transcript.

3

to facilitate the transition to Salesforce.  *Id.* at ¶ 19.  Around November 1, 2022, Ms. Brauner finished this documentation process.  *Id.* at ¶ 20; *see also* DI 18-3 at 146-49.  Then on November 4, 2022, Mr. Simmermon announced a reorganization of the entire IT department.  DI 18-2 at ¶ 21; DI 18-3 at 197.  In connection with this reorganization, Ms. Brauner's direct report — Ms. Liben — was transferred to the Medical Guardian side of the company and Ms. Brauner's position changed to Senior Business Analyst.  DI 18-2 at ¶¶ 22-23; *see also* DI 18-3 at 198.  In her new role, Ms. Brauner reported to Mr. Tamarin, who now oversaw a smaller team of just Ms. Brauner and a contractor named Lakshmi Boyanapalli.  DI 18-2 at ¶ 24.

Over the next few months, the workload diminished across the MedScope line of the IT department.  *See* DI 19-6 at 6, 16:21-17:6; DI 19-7 at 9, 29:4-13.  In January 2023, Mr. Simmermon e-mailed Mr. Johnson about the continued employment of Ms. Brauner and Ms. Boyanapalli.  *See* DI 18-3 at 199-201.  Specifically, Mr. Simmermon wrote, "If you want to keep Lakshmi, you could reduce elsewhere.  Just thinking about issues with marcia, you could eliminate Marcia's position and keep Lakshmi for most of the year."  *Id.*

In February 2023, Mr. Johnson reached out to the Vice President of Human Resources — Emily Berman — to discuss the elimination of Ms. Brauner's position.  *See* DI 18-2 at ¶ 30; DI 18-3 at 202-03.  Then on March 7, 2023, Mr. Johnson reached out again to Ms. Berman, writing that a decision had been made to terminate Ms. Brauner on March 20, 2023.  *Id.*  On that day, Mr. Tamarin and a human resources representative informed Ms. Brauner that her employment was being terminated because of position elimination and budget cuts. DI 18-2 at ¶ 31; DI 19-5 at 32, 120:08-21.  Ms. Brauner was the only person who was terminated at that time, but both Mr. Tamarin and Ms. Boyanapalli have since left the company.  DI 18-2 at ¶ 33.

4

On December 5, 2024 Ms. Brauner sued MedScope and Medical Guardian under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* (ADEA), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* (Title VII), and the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.* (PHRA).  She alleges that MedScope and Medical Guardian discriminated against her on the basis of her age and sex, and retaliated against her for objecting to and complaining about this discrimination and harassment, culminating in her wrongful termination.  DI 1 at 1-2.

The defendants have now moved for summary judgment under Federal Rule of Civil Procedure 56.  They argue that Ms. Brauner cannot demonstrate that the defendants eliminated her position because of her age or gender, nor can she present sufficient evidence of retaliation or harassment. Thus, they request dismissal of all her claims.  DI 18-1 at 10.

## II.    STANDARD OF REVIEW

Rule 56 requires summary judgment movants to "show[] that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  A material fact is one "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986); *see also SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 203 (3d Cir. 2022) ("[F]or a factual dispute to be material, its resolution must have the potential to affect the outcome of the suit.").  And a "genuine dispute" over a material fact means "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  This evidence can be "direct or circumstantial" and "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance."  *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Williams v. Borough of West Chester*, 891 F.2d

458, 460-61 (3d Cir. 1989)).

In deciding whether a genuine dispute of material fact exists, we must "view[] the evidence in the light most favorable to the nonmovant." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010); *see also Young v. Martin*, 801 F.3d 172, 174 n.2 (3d Cir. 2015). We may not "weigh the evidence [or] assess its veracity." *Clews v. Cnty. of Schuylkill*, 12 F.4th 353, 358 (3d Cir. 2021). However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

## III.    DISCUSSION

To prevail on her ADEA, Title VII and PHRA claims, Ms. Brauner must show that her protected traits or activities "actually motivated or had a determinative influence on the employer's adverse employment decision." *Fasold*, 409 F.3d at 183-84 (3d Cir. 2005) (citation modified); *see also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).[3] Ms. Brauner does

---

[3] An adverse employment decision is "one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001) (citation modified). "Minor actions, such as lateral transfers and changes of title and reporting relationships, are generally insufficient to constitute adverse employment actions." *Langley v. Merck & Co.*, 186 F. App'x 258, 260 (3d Cir. 2006). However, "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 71 (citation modified).

Here, the defendants concede that Ms. Brauner suffered an adverse employment action when they terminated her in March 2023. *See* DI 18-1 at 15 n.1. However, the defendants argue that Ms. Brauner's title change from "IT Manager" to "Senior Business Analyst" in November 2022 was not a further adverse employment action. We think that a reasonable jury could find that Ms. Brauner suffered an adverse employment action in November 2022 when her position changed to senior business analyst. While Ms. Brauner's salary remained the same, she lost her direct report, and Mr. Tamarin transitioned from being her colleague to her boss. *Compare* DI 18-3 at 188 (ECF) *with* DI 18-3 at 190; *see also de la Cruz v. New York City Hum. Res. Admin.*

not present direct evidence of such discrimination, and so we will analyze her claims pursuant to the burden-shifting, circumstantial-evidence test established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Duffy v. Paper Magic Grp., Inc.,* 265 F.3d 163, 167 (3d Cir. 2001) (applying the McDonnell Douglas framework when evaluating ADEA claims based on indirect evidence); *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (applying the McDonnell Douglas framework when evaluating Title VII claims based on indirect evidence).[4] Under this framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination.  *Chertoff*, 541 F.3d at 214.  The plaintiff's burden in proving a *prima facie* case is not high; a *prima facie* case "merely raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."  *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995) (citation modified).

If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to

---

*Dep't of Soc. Servs*., 82 F.3d 16, 21 (2d Cir. 1996) (holding that transferring plaintiff to a less prestigious division with fewer opportunities for professional growth was sufficient to show an adverse employment action for purposes of summary judgment); *Torre v. Casio, Inc.*, 42 F.3d 825, 831 n.7 (3d Cir.1994) (finding that "plaintiff created a material fact issue concerning whether he was transferred from his RSM position to a dead-end job that had effectively been eliminated before he was transferred to it.").  Thus, we will evaluate Ms. Brauner's discrimination claims with respect to both her November 2022 demotion and her March 2023 termination.

[4] Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts." *Kelly v. Drexel Univ*., 94 F.3d 102, 105 (3d Cir. 1996).  Thus, to the extent that a plaintiff's claims under the ADEA and Title VII are coextensive with the PHRA, we need not conduct a separate analysis for each of them.  *Id*; *see also Fasold*, 409 F.3d at 184 n.8 (3d Cir. 2005) ("[T]he PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently.") (citation modified).  Here, Ms. Brauner's claims appear coextensive, and so our analysis under the PHRA is the same as for her federal claims.

"articulate some legitimate, nondiscriminatory reason" (LNDR) for its decision. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The employer's burden is relatively light; it meets its burden by presenting evidence which, construed as true, would enable the factfinder to conclude that there was a nondiscriminatory reason for the employer's action. *Id*. "The employer need not prove that the tendered reason actually motivated its behavior." *Id*.

If the employer meets its burden in presenting an LNDR for its action against the employee, the burden then shifts back to the employee to show by a preponderance of evidence that the employer's explanation is pretextual. *Id*. The employee can show pretext by pointing to direct or circumstantial evidence from which the factfinder could reasonably either (1) disbelieve the employer's proffered LNDR (e.g., by painting it as weak, implausible, contradictory, or incoherent); or (2) believe that an invidious, discriminatory reason was, more likely than not, a determinative or motivating cause of the employer's action (e.g., by showing that the employer in the past had subjected her to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of her protected class more favorably, or that the employer has discriminated against other members of her protected class or other protected categories of persons). *Id*. at 765; *see also Steele v. Pelmor Labs. Inc*., 642 Fed. App'x 129, 134 (3d Cir. 2016). Though the employee need not provide evidence directly contradicting the proffered LNDR, she cannot avoid summary judgment merely by arguing that her employer's LNDR need not be believed. *Fuentes*, 32 F.3d at 764. Rather, to survive summary judgment, her evidence rebutting her employer's proffered LNDR must enable the factfinder to reasonably infer that the proffered LNDR was a pretext or post hoc fabrication for the employer's action. *Id*. The employee must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or

8

contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id*. at 765 (citation modified).

### A. The defendants have shown that summary judgment is warranted for Ms. Brauner's age discrimination claim under the ADEA and the PHRA

#### a. Ms. Brauner cannot establish a *prima facie* case of age discrimination

The ADEA provides that "It shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's age . . . ." 29 U.S.C. § 623(a); *see also Potence v. Hazleton Area Sch. Dist.,* 357 F.3d 366, 370 (3d Cir. 2004). To establish a *prima facie* case of age discrimination, a plaintiff must show that: (1) she is forty years of age or older; (2) that the defendant took an adverse employment action against the plaintiff; (3) that the plaintiff was qualified for the position in question; and (4) that the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus. *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009).[5]

Here, the parties do not dispute that Ms. Brauner satisfies the first three prongs of her *prima facie* case. However, there is insufficient support in the record for a reasonable jury to conclude that younger employees assumed Ms. Brauner's job responsibilities after she was

---

[5] In situations where the plaintiff's job was eliminated and he/she was not replaced, the fourth prong can instead "be established where younger employees were retained and assumed the responsibilities of the aggrieved former employee even in the absence of a hired replacement." *LaFiandra v. Accenture LLP*, No. CV 21-3261, 2023 WL 7167115, at *6 (E.D. Pa. Oct. 31, 2023); *see also Billet v. CIGNA Corp.*, 940 F.2d 812, 816 n.3 (3d Cir. 1991).

terminated:  Ms. Brauner, Mr. Tamarin, and Mr. Johnson (the defendants' corporate designee) all testified that Mr. Tamarin — who is older than Ms. Brauner (*see* DI 18-3 at 204-05) — took over Ms. Brauner's remaining job responsibilities.  *See* DI 19-5 at 29, 107:12-15; DI 19-10 at 12, 38:4-7; DI 19-6 at 6, 15:20-16:13. Ms. Brauner also testified that she believes Ms. Greendyk and Megan Shaw — a business analyst who worked under Ms. Greendyk — inherited some of her responsibilities.  DI 19-5 at 28, 105:10-107:16.  But Ms. Brauner has no personal knowledge as to whether this was true, and she has not pointed to any documentary evidence or testimony from other employees that supports her assertion.[6]  *See Nitkin v. Main Line Health,* 67 F.4th 565, 571 (3d Cir. 2023) ("Although we view all facts in the light most favorable to a plaintiff opposing summary judgment . . . bare assertions, conclusory allegations, or suspicions [will not] suffice.") (citation modified); *see also McCann v. Kennedy Univ. Hosp., Inc.,* 596 F. App'x 140, 145-46 (3d Cir. 2014) ("District Courts are not required to search through the record for evidence to support a party's assertion of the existence of a genuine issue of material fact.").  Thus, Ms. Brauner cannot make out a *prima facie* case of age discrimination.

### b.  Ms. Brauner cannot show that the defendants' LNDR was pretextual

Even if there was record evidence that a younger employee inherited some of Ms. Brauner's responsibilities, Ms. Brauner's ADEA claim does not survive summary judgment under the third prong of the *McDonnell Douglas* analysis.  The defendants testified that they demoted and fired Ms. Brauner because there was insufficient work for her after MedScope and Medical Guardian merged.  *See* DI 19-6 at 4, 9:2-24. This is a legitimate reason for her demotion

---

[6] Ms. Brauner acknowledged her lack of personal knowledge as to who inherited her job responsibilities, testifying, "I cannot answer that question because I wasn't there no longer."  DI 19-5 at 29, 107:15-16.  We also note that Ms. Greendyk is older than Ms. Brauner and thus even if she inherited some of Ms. Brauner's responsibilities, this would not help Ms. Brauner's case.

and termination, and Ms. Brauner does not seem to argue otherwise.  *See also LaVeglia v. TD Bank, N.A.,* No. 2:19-CV-01917-JDW, 2020 WL 2512802, at *5 (E.D. Pa. May 15, 2020) (holding that a department reorganization was a legitimate, non-discriminatory reason to terminate the plaintiff).  Thus, to survive summary judgment, Ms. Brauner must offer evidence from which a factfinder could reasonably either (1) disbelieve the defendants' LNDR or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the defendants' action.  *See Fuentes*, 32 F.3d at 764.  Ms. Brauner did not identify a material dispute of fact on either ground.

First, Ms. Brauner has not presented sufficient evidence to meaningfully throw into question the defendants' LNDR.  Ms. Brauner argues that the fact that she received positive reviews about her job performance is a reason to doubt the defendants' LNDR.  *See* DI 19-5 at 6, 14:21-15:1.  But the defendants are not arguing that Ms. Brauner's demotion and termination were triggered by poor performance, and thus her positive reviews are immaterial.

In a related point, Ms. Brauner argues that the January 2023 email exchange between Mr. Johnson and Mr. Simmermon where the two men discussed "issues with Marcia" calls into question the defendants' LNDR.  But Mr. Johnson submitted a declaration that his "issues with Marcia" comment was in reference to that "there was not sufficient work to keep Plaintiff busy," *see* DI 25-2 at ¶ 3, and thus this email exchange is entirely consistent with the defendants' LNDR.  Ms. Brauner has not raised any evidence contradicting Mr. Johnson's declaration, and she cannot speculate as to what Mr. Johnson meant to avoid summary judgment.  *See again Nitkin,* 67 F.4th at 571 ("Although we view all facts in the light most favorable to a plaintiff opposing summary judgment . . . bare assertions, conclusory allegations, or suspicions [will not]

11

suffice.") (citation modified); *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 738 n.2 (E.D. Pa. 2015) ("Summary judgment cannot be avoided by relying on speculation, and 'inference based on speculation . . . does not create a material factual dispute.'") (quoting *Robertson v. Allied Sig., Inc*., 914 F.2d 360, 383 (3d Cir. 1990)).

Next, Ms. Brauner contends that the defendants advanced shifting reasons for her termination, and that this is further reason to disbelieve their LNDR.  Ms. Brauner is correct that "in extreme enough cases, an employer's inconsistencies in its proffered reasons for discharge can constitute evidence of pretext."  *Hoechstetter v. City of Pittsburgh*, 79 F. App'x 537, 539 (3d Cir. 2003).  But typically, the decisionmakers in the adverse employment action must have "totally different and unrelated rationales for the employment decision."  *Id.* at 540.  Here, Ms. Brauner points to the following discrepancies in the defendants' reasons for discharge: (1) Ms. Brauner was informed that she was terminated because of budget cuts and position elimination (*see* DI 19-5 at 9, 26:18-22; DI 19-12 at 2-3); (2) Ms. Berman testified that Ms. Brauner's position was eliminated because "technology was going to be taking over the position." (*see* DI 19-13 at 5, 10:11-16); and (3) other defense witnesses provided alternate reasons including Mr. Tamarin who testified that he was told Ms. Brauner was discharged because of "a change of structure within the IT department as a whole" (*see* DI 19-10 at 12, 40:13-14) and Mr. Johnson indicated that Ms. Brauner's position was eliminated due to "less work in that area" (*see* DI 19-6 at 4, 9:2-7).

These statements fall far short of the standard to demonstrate pretext.  Starting with Ms. Berman, while her stated reason for Ms. Brauner's discharge was slightly different than what Ms. Brauner was told — technology versus budget cuts and position elimination — Ms. Berman

12

was not involved in the decision to terminate Ms. Brauner and thus her testimony on this matter is irrelevant. *See Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 940 (7th Cir. 2022) ("We have held that even a former supervisor's inconsistent statement cannot create an inference of pretext where there is nothing in the record to suggest that the supervisor participated in the decision to terminate.") (citation modified).[7] Additionally, Mr. Tamarin and Mr. Johnson's stated reasons for Ms. Brauner's termination — while not exactly what plaintiff was told — represent a distinction without a difference: The Medical Guardian and MedScope IT departments changed structure (they merged) which caused less work for Ms. Brauner and ultimately her position elimination. Thus, these reasons tell a consistent story that do not cast doubt on the defendants' LNDR. *See also Martinez v. UPMC Susquehanna,* No. 4:19-CV-00327, 2022 WL 17156917, at *8 (M.D. Pa. Nov. 22, 2022) ("[O]ffering an additional, related reason is less likely to indicate discrimination, even if the employer did not previously disclose it.").

Further, Ms. Brauner has not shown pretext by presenting evidence that discrimination was more likely than not a motivating or determinative cause of her demotion and termination. First, Ms. Brauner did not testify that she was subject to a single ageist comment during her employment. Ms. Brauner's only relevant testimony on this issue is that Mr. Simmermon (1) "always gave kudos and always like honored" Nelly Nikulina, a younger business analyst, and (2) she felt Mr. Simmermon was "out to get" her because he did not show her the same warmth as younger employees. DI 19-5 at 38, 143:21-144:1; DI 19-5 at 44, 166:17-167:3. We do not

---

[7] Even if Ms. Berman's statements were relevant, her stated reason that technology was taking over Ms. Brauner's position is not inconsistent with a position elimination: After all, Ms. Brauner was hired to help upgrade MedScope's technology, and once she finished this task, there was less need for her role.

think a fact finder could reasonably construe these vague assertions to mean that the defendants invidiously discriminated against Ms. Brauner because of her age. *See Taylor v. Cherry Hill Bd. of Educ.*, 85 F. App'x 836, 839 (3d Cir. 2004) ("In the context of discrimination claims, we have explained that conclusory allegations of discrimination, in the absence of particulars, are insufficient to defeat summary judgment."); *Tillman v. Redevelopment Auth. of the City of Philadelphia*, No. CIV.A. 12-1505, 2013 WL 5594701, at *8 (E.D. Pa. Oct. 11, 2013) ("A plaintiff's own unsubstantiated, subjective beliefs or suspicions alone would not suffice to persuade a rational trier of fact that age was a factor in the termination decision.").

Nor has Ms. Brauner advanced sufficient evidence that similarly situated people not of Ms. Brauner's protected class were treated more favorably. The Third Circuit makes clear that "while similarly situated does not mean identically situated, the plaintiff must nevertheless be similar in all relevant respects . . . [this] often includes a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 222-23 (3d Cir. 2009) (citation modified); *see also Hampshire v. Bard*, 793 F. App'x 75, 80 (3d Cir. 2019) ("While it is true that the sufficiency of evidence is typically an issue of fact for the jury, a court may nonetheless grant summary judgment if no reasonable jury could find that the individuals identified by the plaintiffs were similarly situated.").

Here, Ms. Brauner argues that the defendants' hiring of two IT Managers — Baskar Periasamy and Brad Davenport — around the time that Ms. Brauner was demoted supports her age discrimination claims. But these IT managers worked in a different department (the Medical

14

Guardian line of business), had a different supervisor (Karina Brodsky), and were tasked with different responsibilities than Ms. Brauner, and thus they were not similarly situated. *See* DI 18-3 at 198; *see also Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013) ("[A]n employee who holds a different job in a different department is not similarly situated."); *Cagnetti v. Juniper Vill. at Bensalem Operations,* No. CV 18-5121, 2020 WL 4039027, at \*10 (E.D. Pa. July 17, 2020) ("The fact that two employees share a job title is insufficient by itself to support an inference that they are suitable comparators.") (citation modified).[8]  Similarly, Ms. Brauner argues that being the oldest business analyst at the company and the only business analyst fired at that time is evidence of pretext.  But the other business analysts worked on different lines of business and with different supervisors, and so they are not fair comparators to Ms. Brauner either.  *See* DI 18-3 at 198.

Meanwhile, the MedScope IT department as a whole retained employees that were both older and younger than Ms. Brauner, which points away from an inference of age discrimination.[9]  *See Alinoski v. Musculoskeletal Transplant Found., Inc.,* 679 F. App'x 224, 226 (3d Cir. 2017) ("Looking at the spread of employees within and outside of Appellant's class, it does not appear to us that [defendant's] treatment of Appellant had anything to do with her age."); *Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 523 (3d Cir. 2003) ("[E]vidence regarding an employer's treatment of other members of a protected class is especially relevant to the issue of the employer's discriminatory intent.").  Finally, Ms. Brauner has not presented

---

[8] We also note that Mr. Davenport is older than Ms. Brauner and thus even if he were similarly situated to Ms. Brauner, this would not help her case.  *See* DI 18-3 at 204.

[9] For example, Ms. Shaw was younger than Ms. Brauner but Mr. Tamarin and Ms. Greendyk were older.  *See* DI 18-3 at 204-05.

evidence that other older employees at the company faced age discrimination. Under these circumstances, no reasonable jury could agree that the defendants demoted or terminated Ms. Brauner because of her age, and accordingly we enter judgment against Ms. Brauner's age discrimination claim.

### B. The defendants have shown that summary judgment is warranted for Ms. Brauner's retaliation claim under the ADEA and the PHRA

In addition to prohibiting age-based discrimination, the ADEA also contains a retaliation provision establishing that:

> It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment . . . because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d). To make out a *prima facie* case of retaliation, a plaintiff must show: (1) that she engaged in protected conduct; (2) that she was subject to an adverse employment action subsequent to such activity; and (3) that a causal link exists between the protected activity and the adverse action. *Barber v. CSX Distribution Servs.,* 68 F.3d 694, 701 (3d Cir. 1995).

In this case, the defendants argue that Ms. Brauner fails to make out the first element of her *prima facie* case and we agree. A person engages in protected conduct when she opposes any practice made unlawful by the ADEA — i.e. opposes age-based discrimination. *Barber*, 68 F.3d at 701; *see also Anderson v. Boeing Co.*, No. CV 15-3073, 2016 WL 9446648, at *20 n.14 (E.D. Pa. Aug. 30, 2016) ("[F]or a retaliation claim under the ADEA, only protected activity related to age discrimination has any relevance, as no other category of conduct is encompassed by the ADEA."). It is not necessary for a plaintiff to write a formal letter of complaint to her employer or the EEOC to engage in protected conduct. *Barber*, 68 F.3d at 701. *See also Sumner*

16

*v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir. 1990) (finding that "informal protests of discriminatory employment practices" are considered protected activity under Title VII's analogous retaliatory provision).  However, the employee must "explicitly or implicitly allege that age was the reason for the alleged unfairness" in her complaint.  *Barber*, 68 F.3d at 702.

Here, the record establishes that Ms. Brauner complained to both Mr. Tamarin and Ms. Greendyk about (1) Mr. Cava dismissing her comments as trivial and (2) Mr. Simmermon telling her, "give them enough rope, so they can hang themselves" in the context of how to manage employees.  Furthermore, Ms. Brauner contextualized these exchanges in her complaint to Ms. Greendyk by saying that she was "always being put down based on the remarks that are made by male figures" at the company.  *See* DI 19-5 at 6, 16:10-12; DI 19-5 at 9, 29:9-11; DI 19-5 at 10-11, 33:9-34:6, DI 19-5 at 26, 97:6-12.  However, there is no evidence that Ms. Brauner either explicitly or implicitly alleged that Mr. Cava or Mr. Simmermon treated her unfairly because of her age, and therefore Ms. Brauner cannot make out a retaliation claim under the ADEA.  *See Barber*, 68 F.3d at 702 ("A general complaint of unfair treatment does not translate into a charge of illegal *age* discrimination."); *Horn v. DeJoy*, No. CV 22-3855, 2024 WL 6937243, at *1 n.2 (E.D. Pa. Jan. 5, 2024) ("Although courts do not require plaintiffs to use any special or magic words, courts have held that grievances unrelated to specifically claimed discrimination do not constitute protected activity for a retaliation claim."). Thus, summary judgment is warranted.[10]

C. **The defendants have shown that summary judgment is warranted for Ms. Brauner's sex discrimination claim under Title VII and the PHRA**

a. **Ms. Brauner cannot establish a *prima facie* case of sex discrimination**

---

[10] We additionally note that Ms. Brauner cannot demonstrate a causal connection between her complaints to Mr. Tamarin and Ms. Greendyk and her subsequent demotion and termination (the third element of her *prima facie* case) for the same reasons that we will explain while analyzing Ms. Brauner's Title VII retaliation claim.

Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92-93 (2003). To establish a *prima facie* case of sex discrimination, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position she sought to attain or retain; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Mandel*, 706 F.3d at 169.

In this case, the parties dispute only whether Ms. Brauner can prove the fourth element of her *prima facie* case, and so we focus our analysis there. While there is no magic formula to make out an inference of intentional discrimination, *see Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999), the Third Circuit sets out guideposts. Specifically, "[a] plaintiff's subjective belief that [gender] played a role in an employment decision is not sufficient to establish an inference of discrimination. However, discrimination may be inferred by showing that the employer treated a similarly situated employee outside of the plaintiff's class more favorably." *Rodriguez v. Nat'l R.R. Passenger Corp.*, 532 F. App'x 152, 153 (3d Cir. 2013); *see also Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003) ("The central focus of the *prima facie* case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin.") (citation modified).

Here, Ms. Brauner has not introduced sufficient evidence that similarly situated people outside of her protected class — i.e. men —were treated more favorably. Ms. Brauner first points to the defendants' hiring of Mr. Periasamy and Mr. Davenport as evidence of plaintiffs'

18

discriminatory intent, but as we established with her age discrimination claim, these two men worked in a different department, had a different supervisor, and were tasked with different responsibilities than Ms. Brauner, and thus are not fair comparators. Ms. Brauner also compares her treatment to that of Mr. Tamarin, and while his employment terms more closely resembled that of Ms. Brauner, we ultimately do not think a reasonable jury would find him a fair comparator: Mr. Tamarin and Ms. Brauner began with the same title — IT Manager — and worked in the same department, but their similarities end there: Mr. Tamarin oversaw the daily operations of the MedScope IT department and had multiple direct reports. *See* DI 19-10 at 9, 27:10-24; DI 18-3 at 188. Ms. Brauner in contrast had just one direct report, and as mentioned earlier, was hired for the more specific responsibility of upgrading MedScope's CRM software, making her job uniquely vulnerable when she finished this task.

Additionally, the record does not reflect that the defendants treated Mr. Tamarin significantly more favorably. While Mr. Tamarin's title stayed the same after MedScope's reorganization in November 2022, he went from supervising four direct reports to just two. *Compare* DI 18-3 at 188 *with* DI 18-3 at 190. And furthermore, Mr. Tamarin left the company at the end of 2023. *See* DI 18-3 at 205. Thus, Mr. Tamarin's treatment at the company does not support an inference of gender-based discrimination as to Ms. Brauner.[11]

**b. Ms. Brauner cannot show that the defendants' LNDR was pretextual**

---

[11] Ms. Brauner tries to counter these points by arguing that the mere fact that Mr. Tamarin replaced her at the company is sufficient to establish a *prima facie* case of sex discrimination. *See e.g. Johnson v. Keebler-Sunshine Biscuits, Inc.,* 214 F. App'x 239, 242 (3d Cir. 2007). But we do not think it is reasonable to say that Mr. Tamarin replaced Ms. Brauner. While Mr. Tamarin took over Ms. Brauner's remaining job duties, Ms. Brauner's role had largely been rendered obsolete, and thus she was not replaced in any relevant sense. *See* DI 25-2 at ¶ 3.

Even if Ms. Brauner could make out a *prima facie* case of sex discrimination, there are insufficient facts in the record for the jury to conclude that the defendants' LNDR was pretextual.  As we discussed in the context of Ms. Brauner's age discrimination claim, to demonstrate pretext, Ms. Brauner must point to some evidence from which a factfinder could reasonably either: (1) disbelieve the defendants' LNDR or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the defendants' action.  *See Fuentes*, 32 F.3d at 764.  Ms. Brauner has failed to raise an issue of material fact on either ground.  Our analysis for the first ground is identical to our reasoning from Ms. Brauner's age discrimination claim: Neither Ms. Brauner's positive reviews nor the fact that the defendants offered slightly different reasons for her termination sufficiently casts doubt on their LNDR.

Nor has Ms. Brauner given reasonable basis to conclude that an invidious discriminatory reason was more likely than not a motivating cause of the defendants' actions.  First on this point, Ms. Brauner has not pointed to a single instance in the record where the decisionmakers for her demotion and firing — Mr. Simmermon and Mr. Johnson — treated her differently because of her gender.  Ms. Brauner argues that Mr. Simmermon's "give them enough rope" comment reveals his bias against women.  But while his "give them enough rope" remark may reflect on Mr. Simmermon's insensitivity and unprofessionalism, it does not implicate gender and thus we do not think a factfinder could reasonably construe it as evincing a discriminatory animus.  *Compare Alinoski*, 679 F. App'x at 227 (finding that the defendant accusing plaintiff of acting "like a victim" and having a "brain meltdown" were "offensive" but did not "evince any [gender-based] discriminatory animus") (citation modified) *with Ostrowski v. Prudential Equity*

*Grp., LLC,* No. CIV.A. 3:03-CV-0459, 2006 WL 1330113, at *8 (M.D. Pa. May 12, 2006) (finding that defendant telling plaintiff, "This is a man's business. It's a man's world" and referring to the plaintiff and other women as "bitches" was sufficient to support an inference of discrimination). Ms. Brauner also characterizes Mr. Simmermon as "very male dominated." *See* DI 19-5 at 36, 135:7-14. But as we explained with her age discrimination claim, vague accusations are not enough to defeat a summary judgment motion. *See again Taylor*, 85 F. App'x at 839 ("In the context of discrimination claims, we have explained that conclusory allegations of discrimination, in the absence of particulars, are insufficient to defeat summary judgment."); *Redevelopment Auth. of the City of Philadelphia*, 2013 WL 5594701, at *8 ("A plaintiff's own unsubstantiated, subjective beliefs or suspicions alone would not suffice to persuade a rational trier of fact that age was a factor in the termination decision.").

Next, Ms. Brauner argues that Mr. Cava's dismissal of her comments as "trivial" in meetings supports her gender discrimination claim. But Mr. Cava — like Mr. Simmermon — did not reference gender, and thus his remarks do not clearly support an inference of gender bias. Additionally, Ms. Brauner testified that Mr. Cava's comments were related to a broader tension between MedScope's IT department and Medical Guardian's IT department, where members of the Medical Guardian team acted dismissively towards members of the MedScope team. *See* DI 19-5 at 9, 28:23-29:24; DI 19-5 at 13-14, 45:6-46:10. And this office tension did not break down neatly along gender lines, as Ms. Brodsky was one of the leaders of the Medical Guardian team. *Id.* at 9, 29:9-20. Finally, even if Mr. Cava's comments were sexist in nature, this would not rebut the defendants' LNDR as there is no evidence that Mr. Cava had influence over Ms. Brauner's demotion and termination. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d

21

509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight."); *Fennell v. Comcast Cable Commc'ns Mgmt., LLC*, 628 F. Supp. 3d 554, 584 (E.D. Pa. 2022)  ("The comments made to [plaintiff] are undoubtedly crude, unprofessional, and inappropriate, but they were made . . . by persons who, as the record reflects, have had no role in [plaintiff's] compensation determination. Without more, the inferential leap from these isolated incidents to [plaintiff's] compensation determination is too attenuated to support a showing of pretext.").

Lastly, Ms. Brauner has failed to demonstrate pretext by pointing to comparators.  In addition to our earlier points about Mr. Periasamy, Mr. Davenport and Mr. Tamarin being unfair comparators, Ms. Brauner has not presented any evidence that Mr. Johnson or Mr. Simmermon harassed or discriminated against other women employees.  Ms. Brauner worked with at least four other women — Ms. Boyanapalli, Ms. Greendyk, Ms. Shaw, and Ms. Nikulina — none of whom faced adverse employment actions during Ms. Brauner's employment.  Ms. Brauner even testified, as we mentioned earlier, that Mr. Simmermon favored Ms. Nikulina, and that she thinks he should have fired her instead of Ms. Brauner.  DI 19-5 at 38, 143:21-144:5.  All of this weighs against Ms. Brauner's gender being a motivating or determinative factor in her demotion and firing.  *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998) ("[E]vidence can not be viewed in a vacuum.")*; Alinoski*, 679 F. App'x at 227 ("Looking at the spread of employees within . . . Appellant's class, it does not appear to us that [defendant's] treatment of Appellant had anything to do with her [sex].").  In summary, the record lacks sufficient evidence for a reasonable jury to conclude that Ms. Brauner was demoted and fired for her gender, and thus we dismiss her sex discrimination claim.

### D. The defendants have shown that summary judgment is warranted for Ms. Brauner's retaliation claim under Title VII and the PHRA

Title VII provides a similar anti-retaliation provision to the ADEA. Specifically, the statute says:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). To establish a *prima facie* case for retaliation, a plaintiff must show: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006).

Here, the defendants argue that Ms. Brauner cannot establish the first and third elements of her *prima facie* case. We think Ms. Brauner's case survives summary judgment on the first element but comes up short on the third. With respect to the first element, the plaintiff "must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." *Moore*, 461 F.3d at 341. To meet this threshold, the plaintiff "need not prove the merits of the underlying discrimination complaint in order to seek redress." *Id.* at 344 (citation modified). Rather, "all that is required is that the complaint is 'specific enough to notify management of the particular type of discrimination at issue in order to constitute protected activity.'" *Bonson v. Hanover Foods Corp.*, 451 F. Supp. 3d 345, 357 (M.D. Pa. 2020) (quoting *Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 288 (3d Cir. 2010)); *see also Newell v. Heritage Senior Living, LLC,* No. CV 12-6094, 2016 WL 427371, at *7 (E.D. Pa. Feb.

23

3, 2016) ("Protests or complaints need not specify discrimination or other magic words to qualify as protected activity.") (citation modified).

Here, as we described above, Ms. Brauner complained to both Mr. Tamarin and Ms. Greendyk about: (1) Mr. Cava dismissing her remarks as trivial and (2) Mr. Simmermon telling her "give them enough rope, so they can hang themselves" in the context of how to manage employees. These comments alone do not reveal a particular type of discrimination, but because Ms. Brauner also contextualized these exchanges by saying that she was "always being put down based on the remarks that are made by male figures," we think, a reasonable jury could consider this protected activity opposing sex discrimination.

Still, there is insufficient support in the record to demonstrate a causal connection between Ms. Brauner's complaints and the adverse actions she faced. "We consider a broad array of evidence in determining whether a sufficient causal link exists to survive a motion for summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (citation modified). One of the strongest pieces of evidence is temporal proximity between the protected activity and the retaliatory act. *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279 (3d Cir. 2000). Some caselaw even suggests that "[w]here the temporal proximity between the protected activity and the adverse action is unusually suggestive, it is sufficient standing alone to create an inference of causality." *LeBoon* 503 F.3d at 232. (citation modified).

Here, we know that Ms. Brauner was demoted around November 1, 2022, and was fired on March 20, 2023, but the record does not reveal when Ms. Brauner complained to Mr. Tamarin and Ms. Greendyk. The only guidance we have is Ms. Brauner's opposition brief, where she represents that she complained to these individuals in the October 2022 timeframe. DI 19-2 at

24

15.  But "in order to defeat a properly supported motion for summary judgment, a plaintiff cannot simply rely on vague, self-serving statements which are unsupported by specific facts in the record." *Heffron v. Adamar of New Jersey, Inc.*, 270 F. Supp. 2d 562, 574-75 (D.N.J. 2003) (citation modified); *see also Herbert v. Newton Mem'l Hosp.*, 933 F. Supp. 1222, 1229 (D.N.J. 1996) ("A non-moving party must point to concrete evidence in the record which supports each essential element of his case.  If the party fails to provide such evidence, then [s]he is not entitled to a trial and the moving-party is entitled to summary judgment as a matter of law.") (citation modified); Fed. R. Civ. P. 56(e).  Juries may not speculate.  Because there is no evidence of when Ms. Brauner lodged her complaints to Mr. Tamarin and Ms. Greendyk, no reasonable jury could conclude that the timing between her protected activity and when she was demoted and fired was unusually suggestive.[12]

In cases where the temporal proximity is not unusually suggestive, "we ask whether the proffered evidence, looked at as a whole, may suffice to raise the inference [of causation]." *LeBoon,* 503 F.3d at 232 (citation modified).  "Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *Id.* at 232-33.  Here, the record does not support an

---

[12] We additionally note that while a context dependent consideration, "unusually suggestive timing has generally been understood to mean no more than a handful of days" between the protected activity and the adverse employment action. *See Kern v. DAS Companies Inc.*, No. 24-2420, 2025 WL 2170324, at *9 n.4 (3d Cir. July 31, 2025) (citation modified). Therefore, even if we credited Ms. Brauner with having complained in October 2022, there is no evidence that her subsequent demotion occurred only a few days (rather than weeks) later.  And furthermore, her firing occurred five months after October 2022.  All in all, Ms. Brauner cannot use timing alone to establish an inference of causality.

25

inference of causation.  First, while we don't know exactly when Ms. Brauner complained, there is no evidence that Mr. Cava, Mr. Simmermon, or any other employee subjected her to increased harassment after her protected activity.  *See id.* at 234 ("[A]lthough the evidence in the record clearly shows a tense relationship between [plaintiff] and [defendant's employee], it does not sustain the inference that it was caused by [plaintiff's] protected activity.").  Nor, as we have discussed above, has Ms. Brauner demonstrated inconsistencies in the defendants' articulated reasons for demoting and terminating her or otherwise called into question their LNDR.

Finally, there is no evidence that Mr. Simmermon or Mr. Johnson — the decisionmakers in her demotion and firing — knew about her protected activity:  Ms. Brauner admitted in her deposition that she never complained about discrimination to these two men.  *See* DI 19-5 at 44, 167:10-24.  Nor is there evidence that either Mr. Tamarin or Ms. Greendyk informed Mr. Johnson or Mr. Simmermon about her complaints.  The closest evidence Ms. Brauner presents on this front is that Ms. Greendyk would often bring information that the two of them discussed to Mr. Johnson's attention.  *See* DI 19-5 at 10, 33:14-22.  But she has no personal knowledge as to whether Ms. Greendyk raised her specific sex discrimination complaints with Mr. Johnson, and Mr. Johnson submitted a declaration to the contrary, averring "I was not aware of any complaint from Plaintiff regarding any belief that she was treated differently because she was a woman."  DI 25-2 at ¶ 2.  *See also Daniels v. Sch. Dist. of Philadelphia,* 776 F.3d 181, 196 (3d Cir. 2015) ("The plaintiff, however, cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted."); *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007) ("[Plaintiff], moreover, has not proffered any evidence that the supervisors responsible for the

26

alleged adverse actions were aware that [plaintiff] had informally complained.").  In sum, no reasonable jury could find that Ms. Brauner's demotion and termination were caused by her complaints to Mr. Tamarin and Ms. Greendyk, and thus we enter judgment against her on her retaliation claim.[13]

### E. The defendants have shown that summary judgment is warranted for Ms. Brauner's hostile work environment claim under Title VII and the PHRA

As we stated above, Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e–2(a)(1).  These protections "not only cover[] terms and conditions in the narrow contractual sense, but . . . strike at the entire spectrum of disparate treatment of men and women in employment."  *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 78 (1998) (citation modified).  Thus, "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  *Id.* (citation modified).

To establish a hostile work environment claim, a plaintiff must show: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was severe or persuasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally

---

[13] We will not address pretext here because Ms. Brauner cannot make out a *prima facie* case of retaliation and because our pretext analysis would be largely repetitive to our pretext analysis from earlier sections.  We note however that since there is insufficient record evidence to show causation between Ms. Brauner's protected activity and her demotion and firing, she certainly would not be able to demonstrate pretext "where the factual inquiry into the alleged discriminatory motives of the employer has risen to a new level of specificity."  *Simpson,* 142 F.3d at 646.

affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability. *Mandel*, 706 F.3d at 167.

Here, the defendants argue that Ms. Brauner has not established the second element of her hostile work environment claim and we agree. For discrimination to rise to the level of severe and persuasive, it must create "an objectively hostile or abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Indeed, the environment must "alter the conditions of [the victim's] employment." *Nitkin*, 67 F.4th at 570. Occasional statements that "engender[ ] offensive feelings in an employee" are not sufficient to meet this standard. *Harris,* 510 U.S. at 21. In evaluating whether an environment is hostile or abusive we consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 23.

Here, Ms. Brauner argues that Mr. Cava's remarks dismissing her comments as trivial created an abusive workplace, but this conduct falls far short of what she must show to make out a hostile work environment claim: There is no evidence that Mr. Cava physically threatened Ms. Brauner, nor is there any evidence that his comments interfered with her work performance. As for the frequency of his hostile conduct, Ms. Brauner testified that Mr. Cava made these remarks only in "a couple of meetings." DI 19-5 at 6, 15:10-16. From these facts, no reasonable jury could find such conduct severe or persuasive. *See Kendrell v. Mattis*, No. CV 17-229, 2018 WL 5785446, at *6 (E.D. Pa. Nov. 5, 2018) (granting summary judgment to defendant despite defendant's employee giving "abrupt, off the cuff project instructions", being "overly critical, sarcastic, or cynical" and telling plaintiff that she "was tired of hearing [plaintiff's] disability as

28

an excuse" because such conduct "does not alone evidence a hostile work environment") (citation modified); *Williams v. Pennsylvania Hum. Rels. Comm'n*, No. CV 14-1290, 2016 WL 6834612, at *24 (W.D. Pa. Nov. 21, 2016) (granting summary judgment to defendant because "[r]ude behavior and disagreement with [plaintiff], even if [plaintiff] could be characterized as generally agreeable in the workplace, would not meet the requirements to show a hostile work environment"); *Dreshman v. Henry Clay Villa*, 733 F. Supp. 2d 597, 614 (W.D. Pa. 2010) (granting summary judgment to defendant because "the incidents alleged were largely verbal comments directed toward Plaintiff and, while the content of the statements were sometimes offensive and their utterances certainly were unprofessional, the mere utterance of an epithet, joke, or inappropriate taunt that may cause offense . . . are not sufficiently severe or pervasive to be actionable") (citation modified); *Rose v. Woolworth Corp.*, 137 F.Supp.2d 604, 607-11 (E.D. Pa. 2001) (granting summary judgment to defendant despite defendant's employee subjecting plaintiff to "constant and unremitting negative comments and evaluations" because such conduct did not "constitute a change in terms and conditions of employment") (citation modified).  Thus, we enter judgment against Ms. Brauner on her hostile work environment claim.[14]

## IV.    CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment is granted. Ms. Brauner failed to adduce evidence sufficient for a reasonable jury to find the defendants liable for age discrimination or retaliation under the ADEA and the PHRA or for gender

---

[14] Ms. Brauner does not argue that Mr. Simmermon's "give them enough rope" comment also created a hostile work environment.  But even if we were to take this comment into account, it would not help her case as "offhand comments[] and isolated incidents (unless extremely serious) [do] not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citation modified).

discrimination or retaliation under Title VII and the PHRA.  Therefore, we must grant the

defendants' motion for summary judgment.